UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Keystone Northeast, Inc., f/k/a Pavers Plus GSP, Inc., assignee of Madawaska Brick and Block Corp., | ) ) ) | Civil Action No.: 6:12-cv-720-BHH |
| | ) | |
| Plaintiff, | ) | **Opinion and Order** |
| vs. | ) ) | |
| Keystone Retaining Wall Systems, LLC, f/k/a Keystone Retaining Wall Systems Inc., a division and wholly owned subsidiary of Contech Construction Products, Inc., | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

This matter is before the Court on the defendants' motion for summary judgment (ECF No. 109) and the plaintiff's motion for partial summary judgment (110). For the reasons set forth in this order, the defendants' motion for summary judgment is granted in part and denied in part, and the plaintiff's motion for summary judgment is granted to the extent set forth in this Order.

## BACKGROUND

The defendant Keystone Retaining Wall Systems, LLC ("KRWS") is a division and wholly owned subsidiary of the defendant, Contech Construction Products, LLC ("Contech") (collectively "the defendants"). Beginning in the 1980s, KRWS developed and designed a segmental block retaining wall system. KRWS owned the intellectual property and "know how" for this system and issued licenses that granted various

manufacturers the right to act as the exclusive producer of KRWS's retaining wall blocks within a defined geographical area.  These licenses did not restrict where the blocks could be sold, but because of their weight and the cost of transporting them, it is commercially necessary to sell them within the geographic region where they are produced.  Although the terms of individual licenses may vary, licensees are typically required to make reasonable efforts to manufacture and market the KRWS products and are subject to sales quotas, which are measured in square feet.  KRWS receives a portion of the licensee's proceeds as set forth in the licensing agreement.

In 1988, KRWS entered into a licensing relationship with Madawaska Brick and Block Corporation ("Madawaska"), and its principal, Dan Albert ("Albert").  Madawaska is the predecessor of the plaintiff, Keystone Northeast, Inc. ("KNE"), which is also owned and operated by Albert.  The instant action involves the interpretation of a series of license agreements and license renewal agreements (collectively the "License Agreement") between KRWS and KNE.  It also involves the interpretation of a series of agreements through which KNE transferred portions of its licensed territory back to KRWS and allowed KRWS to deal directly with its manufactures in return for a share of the manufacturers' royalty payments (collectively the "Transfer Agreements").  The relevant agreements are described in more detail below.

**The License Agreements**

On April 26, 1988, KRWS entered into a license agreement (the "1988 License Agreement") with Madawaska for the manufacture, marketing, and sale of the segmental retaining wall block designed by KRWS.  (*See* Am. Compl., Ex. 1, ECF No. 39.)  Pursuant to the 1988 License Agreement, Madawaska was granted an exclusive

license to manufacture and sell KRWS's retaining wall system in Maine, New Hampshire, and Eastern Massachusetts. The parties entered into several follow up license agreements, the most recent of which is dated January 2, 1998 ("1998 License Agreement"). (*See* Am. Compl., Ex. 6, ECF No. 39-5.)

Section 18 of the 1998 License Agreement governs the term of the agreement and provides as follows:

> This Agreement shall commence as of the date hereof and continue until the first to occur of:
>
> (a) January 1, 2001, with renewals for successive year terms as per the terms of previously existent license agreement with subsequent establishment of performance goals reasonably based upon previous years performance and market condition;
>
> (b) Termination by mutual agreement of the parties;
>
> (c) Termination under the provisions of Paragraph 20 of this Agreement;
>
> (d) The failure of Licensee [KNE] to sell its quota square feet equivalent units of the Product in any given period as set forth in [attached schedule];
>
> (e) The knowing or reckless provision by Licensee of a false Unit License Fee report; or
>
> (f) Licensee becomes insolvent or is adjudicated bankrupt.

Paragraph 20 permitted KRWS to terminate if KNE defaulted on any of its obligations under the Agreement and failed to remedy the default within 30 days of receiving notice of it from KRWS. The parties agreed that KNE was not entitled to 30 days to cure if it failed to meet its sales quota, but could be terminated immediately.

The 1998 License Agreement was signed by Albert, on behalf of KNE, and William Dawson ("Dawson"), who served as the president of KRWS until 2008. Dawson

is a Stanford-educated attorney and prepared the license agreements at issue in this case. The Transfer Agreements were prepared by a different attorney for KRWS, who was unfortunately killed in an accident. (*See* Transcript of Motion Hearing ("Transcript") 24:1-17, 71:23 – 72:2, Mar. 10, 2015, ECF No. 130.)

**The Transfer Agreements**

The parties agree that KNE did not actually manufacture the KRWS blocks itself, but, with KRWS's approval or acquiescence, contracted with a series of other companies to manufacture and sell the blocks. By the mid-1990s, KNE had developed relationships with reputable concrete block manufacturers in Maine and Massachusetts that produced KRWS products for KNE on a contract basis to serve the New England market. These suppliers included Gagne & Son Concrete Block ("Gagne"), which was located in Belgrade, Maine, and Adolf Jandris & Sons, Inc. ("Jandris") and Hiway Concrete Products ("Hiway"), both of which were located in Massachusetts.

In the late 1990s, KRWS approached KNE about the possibility of dealing directly with its suppliers.[1] In 1999 and 2000, KNE and KRWS entered into the Transfer Agreements in which KNE transferred back to KRWS portions of its licensed territory to allow KRWS to deal directly with these suppliers. In return, KNE was promised a number of benefits, which are discussed in greater detail below.

***The Gagne Transfer Agreement***

The first of these Transfer Agreements, which involved the plaintiff's territory in Maine and its supplier Gagne, was dated December 16, 1999 (the "Gagne Transfer Agreement"). (*See* Am. Compl., Ex. 11, ECF No. 39-10.) Pursuant to the Gagne

---

[1] The defendants allege that this proposal was made as a result of increasingly strained relationships between Albert and his suppliers.

Transfer Agreement, KNE returned its license for the state of Maine to KRWS so that KRWS could enter into a direct licensor-licensee relationship with Gagne.  The contract indicated that the 1998 License Agreement (between KRWS and KNE) would "continue in full force and effect," "except to the extent amended by this agreement."  (*Id.* at ¶ 2.)  In return for the transfer of the Maine territory, KRWS agreed to share the fees it received from Gagne with KNE pursuant to a schedule attached to the agreement.  (*Id.* at ¶ 3.)  The parties also agreed that Gagne's sales would count toward KNE's annual sales quota.  (*Id.* at ¶ 5(a).)  The License Agreement between KRWS and Gagne (the "Gagne License Agreement"), which set forth Gagne's sales quota, was attached to the Gagne Transfer Agreement as an exhibit.  The Gagne Transfer Agreement provided that if the Gagne License Agreement is "terminated for any reason, then [KRWS] shall amend [KNE's] then current license agreement to include the state of Maine."  (*Id.* at ¶ 4.)  It also provided that in such an instance, "[t]he [1998] License [Agreement] shall otherwise not be amended, no initial fee payment shall be required, and the performance requirements shall remain the same."  (*Id.*)

Finally, the Gagne Transfer Agreement added the states of Rhode Island and Vermont to KNE's territory and granted KNE a right of first refusal to acquire the licensing rights for the "Territory of Western Massachusetts."  Paragraph 5(G)(iii) of the agreement provides:

> [KRWS] agrees that [KNE] shall have a first right of refusal to obtain the license to the Western Massachusetts Territory before Keystone may accept a third party offer to acquire that license.  The only terms of a third party offer that KNE must meet in order to exercise its right are to match the initial license fee up to a maximum of $25,000.00 and an addition of 75,000 square feet to [KNE's] existing quota.

*Id.*

5

### *The Jandris and Hiway Transfer Agreements*

In 2000, KNE entered into similar transfer agreements with KRWS to allow KRWS to deal directly with Jandris and Hiway (respectively the "Jandris Transfer Agreement" and the "Hiway Transfer Agreement"). (*See* Am. Compl., Ex. 13, ECF No. 12 (Jandris) and Am. Compl., Ex. 15, ECF No. 14 (Hiway).) Like the Gagne Transfer Agreement, the Jandris and Hiway Transfer Agreements provided that KNE would receive a portion of the royalties that KRWS received from the sales of Jandris and Hiway, that the sales of Jandris and Hiway would count toward KNE's annual sales quota, and that in the event that the license agreements reached between KRWS and Jandris and Hiway (respectively the "Jandris License Agreement" and the "Hiway License Agreement") were terminated for any reason, the territory would revert to KNE under the terms of the current license between KNE and KRWS. As before, the license agreements reached between KRWS and the manufacturers were attached as exhibits to the transfer agreements between KRWS and KNE.

As a part of the Jandris Transfer Agreement, KRWS also granted KNE the territory of Western Massachusetts, which KNE then transferred back along with portions of Eastern Massachusetts for the purpose of allowing KRWS to deal directly with Jandris. The defendants allege that Jandris and KNE each paid KRWS $12,500 in connection with the transfer. The Jandris Transfer Agreement does not, however, list any up-front monetary payment as a part of the consideration for the Territory of Western Massachusetts. It also does not indicate whether KNE acquired the Territory of Western Massachusetts by exercising its first right of refusal, whether a third-party offer was made for the Territory of Western Massachusetts and what the terms of such

an offer were, whether these terms were communicated to KNE, and whether KNE's quota was increased as a result of acquiring the Territory of Western Massachusetts.

**The 2005 Renewal Agreement**

On September 12, 2005, KNE and KRWS entered into a license renewal agreement (the "2005 Renewal Agreement").  (*See* Am. Compl., Ex. 17, ECF No. 39-16.)  The 2005 Renewal Agreement is a brief document that provides in relevant part:

> WHEREAS, Licensor and Licensee desire to renew their prior license agreement, dated January 2nd, 1998 (hereinafter referred to as the "License Agreement"); and
>
> WHEREAS, Licensor and Licensee have previously executed written transfer agreements by which portions of the License Agreement have been amended (the "Transfer Agreements");
>
> NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the parties hereto agree as follows:
> AGREEMENTS
>
> 1.    The License Agreement, as amended by the Transfer Agreements, is hereby renewed through December 31, 2010, with no change in the Performance Requirements.
>
> 2.    The License Agreement and Transfer Agreements otherwise are not amended.

Albert signed the document on behalf of KNE and Dawson signed the document on behalf of KRWS.  The 2005 Renewal Agreement does not indicate numerically what KNE's sales quota was as of 2005, and it does not include any other language indicating one way or the other whether the parties understood KNE to have exercised its right of first refusal for the Territory of Western Massachusetts and to have accepted a 75,000 square-foot increase to its quota.

**Termination**

2008 was a very difficult year in the construction industry.  The plaintiff alleges that, during this time, new management from Contech took over at KRWS, and that Dawson was no longer serving as president.  Gagne, Jandris, and Hiway had an awful year with Gagne meeting 43.7% of its quota, Jandris meeting 20.3% of its quota, and Hiway meeting 69.4% of its quota.  Including the aggregated sales of Gagne, Jandris, and Hiway, for which KNE received credit pursuant to the Transfer Agreements, KNE's sales figure for 2008 was 538,037 square feet.[2]

On March 17, 2009, John Schramm ("Schramm"), the Keystone Sales Manager for KRWS, sent a letter to Albert terminating the license agreement between KRWS and KNE.  The letter referenced the Gagne Transfer Agreement and explained:

> The parties also agreed to renew the License Agreement through December 31, 2003, with revised sales quotas for each year of the renewal term and with the sales quota for 2003 being 500,000 square feet of product.  That Agreement also provided that [KNE's] sales quota would increase by 75,000 square feet if Keystone Northeast obtained the license for the Western Massachusetts Territory.

The letter then explained that the Jandris Transfer Agreement had granted KNE Western Massachusetts, and that KNE had, as a part of the same agreement, transferred a portion of Western Massachusetts back to KRWS so that KRWS could deal directly with Jandris.  The letter referenced the 2005 Renewal Agreement and pointed out that it had "renewed the term of the license Agreement through December 31, 2010, with no change in the sales quotas previously established.  The letter then concluded as follows:

> In calendar year 2008, the combined total square feet of Keystone product sold in the Territory under the License agreement, including sales by

---

[2] Due to a miscalculation, this number was initially reported to be only 517,000 square feet.

> Jandris, Hiway, and Gagne, was 517,904 square feet.  As a result of [KNE's] failure to sell its required sales quota in 2008, which is a breach of the terms of the Licensing Agreement, [KRWS] hereby advises you that it is terminating the License Agreement with [KNE] effective December 31, 2008.

(Am. Compl., Ex. 18, ECF No. 17.)

In addition to terminating the license agreement with KNE, KRWS promptly stopped paying KNE its portion of the royalty payments for sales made by Gagne, Jandris, and Hiway.

**Procedural History**

The plaintiff filed its original complaint (ECF No. 1) on March 12, 2012, advancing causes of action for breach of contract regarding both the License Agreement and the Transfer Agreements, tortious interference with contractual relations, intentional interference with prospective contractual relations, breach of fiduciary duty, breach of contract accompanied by a fraudulent act, violation of the South Carolina Unfair Trade Practices Act (SCUTPA), and negligent misrepresentation.  It also seeks a declaratory judgment holding that the payment of royalties pursuant to the Transfer Agreements is not contingent on the continuation of the license agreement.  The case was originally assigned to the Honorable Timothy M. Cain, but was reassigned to the Honorable Mary Geiger Lewis on July 6, 2012.  The defendants filed a motion to dismiss the case, which Judge Lewis denied on October 11, 2012.   The plaintiff filed an amended complaint (ECF No. 37) on November 15, 2012.  The amended complaint, which is the operative complaint in this action, retains all of the plaintiff's original causes of action with the exception of the SCUTPA claim.

On June 27, 2014, the case was transferred from Judge Lewis to the undersigned.  On July 2, 2014, the attorneys serving as plaintiff's counsel filed a motion to withdraw from the case after having been terminated by Albert.  The Court permitted the plaintiff's former counsel to withdraw, but advised Albert that he would have to retain substitute counsel immediately.   The Court also ordered KNE to reimburse the defendants for the cost of a deposition that had to be cancelled at the last minute because Albert had terminated his counsel.  (*See* ECF No. 98.)

In early August, the plaintiff retained substitute counsel, Greenville attorneys, Paul Landis, Wally Fayssoux, and Beattie Ashmore.  Given the age of the case, the Court advised the parties that, if a trial was necessary, it would be conducted in early 2015.   From what the Court can see, the parties have been extremely diligent in completing their discovery, filing dispositive motions, and preparing the case for trial. The plaintiff's new counsel quickly brought themselves up to speed in a case they have had now for just over six months, and the defendants' counsel, Paul Joyce, Anthony Colucci, and Tom Vanderbloemen have been considerate, cooperative, and professional throughout this case.   The Court sincerely appreciates the way both parties' counsel have handled this matter.

On January 28, 2015, the parties filed cross-motions for summary judgment. (*See* ECF No. 109 (defendants) and ECF No. 110 (plaintiff)).  The defendants' motion seeks summary judgment on all counts, and the plaintiff's motion seeks summary judgment on its breach of contract claims.[3]  On March 10, 2015, the Court selected a jury in this case and held a hearing on the parties' motions for summary judgment.  The

---

[3] The plaintiff withdrew its causes of action for breach of contract accompanied by a fraudulent act and for negligent representation.  (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. for Sum. J., 26-27, ECF No. 115.)

arguments offered by the attorneys for both sides were excellent.  The case is complicated in that it in involves a long history and numerous contracts that are at issue, and the Court appreciates the quality of the representation on both sides.

## STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the party moving for summary judgment carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1996). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

As the Fourth Circuit has observed, "[a] court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992). "[F]ederal courts sitting in diversity should apply state contract law as would a court in that state . . . . [h]owever, federal law must govern whether a question is one of law or fact." *Archer Daniels Midland Co. v. Brunswick Cnty., N.C.*, 129 F. App'x 16, 23 (4th Cir. 2005) (citing *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1438 (7th Cir. 1993)). "Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible of two reasonable interpretations.'" *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245 (quoting *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir.1965)).

A court should first consider "whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245. In reaching this determination, the court must "consider particular provisions in the context of the entire agreement." *Atkinson Warehouse & Distribution, Inc. v. Ecolab Inc.*, 15 F. App'x 160, 163 (4th Cir. 2001). If the court finds the provisions to be unambiguous, it should resolve the matter on summary judgment. If the court finds the contract ambiguous, it may then "examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245. In other words, "summary judgment is only appropriate 'when the contract in question is unambiguous or when an ambiguity can be

definitively resolved by reference to extrinsic evidence.'" *Sheridan v. Nationwide Ret. Solutions, Inc.*, 313 F. App'x 615, 617 (4th Cir. 2009) (quoting *Goodman v. R.T.C.*, 7 F.3d 1123, 1126 (4th Cir.1993)). "If . . . resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact. *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245.

In reviewing the substance of the Agreement, the Court applies the substantive law of the underlying state. The License Agreement specifically provides that it is governed by the law of Minnesota, and the parties agree that Minnesota law governs its construction. The parties disagree about the law that should govern the Transfer Agreements, which do not contain choice of law provisions. The defendants argue that the Court should construe the Transfer Agreements as mere amendments to the License Agreement, and thus Minnesota law should govern. The plaintiff argues that the Transfer Agreements are stand-alone agreements that should be interpreted under South Carolina law. The Court will apply Minnesota law because the Transfer Agreements are, at least to some extent, amendments to the License Agreement. However, because the plaintiff has argued that the Transfer Agreements should be interpreted as separate agreements, the Court has included citations to parallel South Carolina authority, which illustrates that the outcome is the same regardless of which state's law governs.

Under the law of both states, a court's goal should be to ascertain and enforce the intent of the parties. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004) ("The primary goal of contract interpretation is to determine and

enforce the intent of the parties."); *Taylor v. Lindsey*, 332 S.C. 1, 4, 498 S.E.2d 862, 863-64 (1998) ("[T]he paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document.") (citations and quotation marks omitted).  In both states, courts are to begin with the plain language of the agreement, and if it is clear, they are to enforce it as written.  *See Paradigm Enterprises, Inc. v. Westfield Nat. Ins. Co.*, 738 N.W.2d 416, 421 (Minn. Ct. App. 2007) ("Where there is a written agreement, we determine the parties' intent based on the plain language of the document."); *Stevens Aviation, Inc. v. DynCorp Int'l LLC*, 407 S.C. 407, 416, 756 S.E.2d 148, 152 (2014), *reh'g denied* (June 25, 2014) ("Contract interpretation begins with the plain language of the agreement.") (citations and quotation marks omitted); *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 171, 568 S.E.2d 361, 363 (2002) ("It is not the function of the court to rewrite contracts for parties.").

In both states courts are to construe a contract as a whole, seeking to make sense of the entire document.  *See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("We read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result. Additionally, we are to interpret a contract in such a way as to give meaning to all of its provisions.") (citation omitted); *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009) ("A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause."); *Skull Creek Club Ltd. P'ship v. Cook & Book, Inc.*, 313 S.C. 283, 286, 437 S.E.2d 163, 165 (Ct. App. 1993) (A contract should "be construed as a whole and different provisions dealing with the same subject matter are to be read together.").

In both states, parol evidence may be used to determine the meaning of an ambiguous contract. *Flynn v. Sawyer*, 272 N.W.2d 904, 907-08 (Minn. 1978) ("[P]arol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement[,]" but "is admissible when the written agreement is incomplete or ambiguous to explain the meaning of its terms."); *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977) ("[I]t is the general rule that parol evidence is admissible to show the true meaning of an ambiguous written contract.). If ambiguity remains after parol evidence is considered, courts in both states are instructed to construe ambiguities in the language of a contract against the party who drafted it. *See Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 854 (8th Cir. 2008) ("Minnesota does follow the maxim that an ambiguous contract will be construed against the drafter, but this rule applies only as a last resort, after all other evidence fails to demonstrate the intent of the parties.") (citing *e.g., Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979); *see also Mathis v. Brown & Brown of S. Carolina, Inc.*, 389 S.C. 299, 309, 698 S.E.2d 773, 778 (2010). (Courts should "construe any doubts and ambiguities in an agreement against the drafter of the agreement.").

Finally, both Minnesota and South Carolina recognize an implied covenant of good faith and fair dealing. *See Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc.*, 433 F.3d 637, 641-42 (8th Cir. 2006) ("The implied covenant of good faith and fair dealing requires that no party to a contract unjustifiably hinder the other party's performance of the contract" and "prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract.") (citation omitted); *Osborn v. Univ. Med. Associates of Med. Univ. of S. Carolina*, 278 F. Supp. 2d

720, 741 (D.S.C. 2003) (citing *Williams v. Riedman*, 339 S.C. 251, 265, 529 S.E.2d 28, 35 (Ct. App. 2000) for the proposition that there exists in every contract an implied covenant of good faith and fair dealing).

## DISCUSSION

### I.    **Breach of Contract Claims**

KNE alleges that KRWS breached the License Agreement by terminating it without sufficient justification and that KRWS breached the Transfer Agreements by discontinuing its royalty sharing payments from the sales of Gagne, Jandris, and Hiway. The plaintiff alleges that the obligation to share these royalties continues to exist as long as KRWS continues to do business with Gagne, Jandris, and Hiway, regardless of whether the License Agreement remains in force.  The defendants argue that they were entitled to terminate the License Agreement because KNE defaulted on the agreement by failing to make its 2008 sales quota.   They also maintain that the Transfer Agreements are merely amendments to the License Agreement, and that as such, they should be interpreted as a single document.  Thus, they argue that when they rightfully terminated the License Agreement, they also terminated their obligation to share royalties under the Transfer Agreements.  The defendants argue that if the Court finds that they were not entitled to terminate the License Agreement in 2009, the plaintiff's damages must be limited to the royalty sharing that he would have received through the end of 2010, since the term of the 2005 Renewal Agreement extended through December 31, 2010.

The parties' arguments regarding the interpretation of the License Agreement and the Transfer Agreements raise three central questions:

16

A. Did KRWS have the right to terminate the License Agreement at the end of 2008?

B. Assuming that it did not have a right to terminate the License Agreement at the end of 2008, would KRWS have been able to terminate the License Agreement as a matter of right at the end of 2010?

C. Is KRWS's obligation to share the Gagne, Jandris, and Hiway royalties with KNE independent of the License Agreement?

Each of these questions will be addressed in turn.

## A. __Did KRWS have the right to terminate the License Agreement at the end of 2008?__

The question of whether KRWS had the right to terminate the License Agreement at the end of 2008 depends on whether KNE defaulted on the License Agreement by failing to meet its sales quota. The parties appear to agree that KNE should receive credit for the sale of 538,037 square feet for 2008. (*See* Aff. of John Schramm, ¶ 10, Jan. 22, 2015, ECF No. 109-3.) Accordingly, the answer to this question turns on what KNE's sales quota for 2008 was. The Gagne Transfer Agreement renewed the License Agreement between KRWS and KNE and set forth gradually increasing quotas that culminated in a 500,000 square-foot quota for 2003 (*see* ¶ 5(G)iv.) The Gagne Transfer Agreement also granted KNE a right of first refusal for the Territory of Western Massachusetts. Pursuant to the agreement, "[t]he only terms of a third party offer" that KNE was required to "meet in order to exercise its right [were] to match the initial license fee up to a maximum of $25,000.00 and an addition of 75,000 square feet to [KNE's] existing quota." The 2005 License Renewal Agreement renewed the License

Agreement "as amended by the Transfer Agreements" . . . "with no change in the Performance Requirements."  Thus, if KNE exercised its right of first refusal, its quota for 2008 was 575,000 square feet, where if it did not exercise its right of first refusal, its quota for 2008 was only 500,000 square feet.  KNE's performance figure for 2008 falls between these numbers, so whether it exercised its right of first refusal is of substantial significance to the case.

A right-of-first-refusal "is similar to an option contract.  The difference is that the right of first refusal requires a condition precedent before it may be exercised."  That is "that the owner must have received a bona fide offer from a third party which he or she is willing to accept."  *Park-Lake Car Wash, Inc., v. Springer*, 352 N.W.2d 409, 411 (Minn. 1984).  The right to first refusal "ripens into an option to purchase when the owner of property receives a bona fide third party offer and notifies the right-holder."  *Stuart v. Stuart*, No. A12-1044, 2013 WL 490825, at *5 (Minn. Ct. App. Feb. 11, 2013), *review dismissed* (Sept. 17, 2013) (quotation marks and citation omitted).   South Carolina authority is similar.  *See Page v. Page*, No. 2004-UP-110, 2004 WL 6249122, at *2 (S.C. Ct. App. Feb. 24, 2004) ("A right of first refusal is a pre-emptive right.  The right of first refusal is a contingent nonvested interest . . . .  It is an interest predicated on an event which is not certain to occur.");  *Peoples Fed. Sav. & Loan Ass'n of S. Carolina v. Res. Planning Corp.*, 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004) ("Because Peoples does not have a pending offer for the purchase of its property, there is currently no justiciable controversy concerning the validity of the preemptive right provision in the Covenants.   Accordingly, the referee erred by ruling on the enforceability of the right of first refusal provision.").  *See generally*, 17 C.J.S. Contracts

§ 58 ("[O]n notice of a bona fide offer from a third party, a right of first refusal ripens into an option to purchase according to the terms of the offer.")  As these authorities make clear, a right of first refusal is contingent and predicated on the existence of a third-party offer that triggers the right to match the terms offered by the third party.  Even when the right is triggered by a third party offer, the holder must still exercise the option by affirmatively providing the required consideration.

The first right of refusal set forth in 5(G)(iii) of the Jandris Agreement reflects and is consistent with the understanding of a right of first refusal as described in the paragraph above.  The provision clearly contemplates the existence of a third-party offer that would trigger the need to exercise the right.  Without such an offer, the right is not implicated even if KNE ends up acquiring the Territory of Western Massachusetts through separate negotiations.

The defendants reason that since the plaintiff (along with Jandris) acquired the Territory of Western Massachusetts, it must have exercised its right of first refusal – end of story.  This argument treats the addition to the plaintiff's quota as if it were contingent on its acquisition of the Territory of Western Massachusetts as opposed to its exercise of the right of first refusal.  Indeed, the defendants' termination letter (*see* ECF No. 110-2) makes it sound as if the former is all that is required to increase the quota.  "[The Gagne Transfer] Agreement . . . provided that [KNE's] sales quota would increase by 75,000 square feet if Keystone Northeast obtained the license for the Western Massachusetts Territory."[4]

---

[4] For another example of this reasoning, see the deposition testimony of Ed Zax at 126:9-15:

> Q        . . . how did you reach the conclusion that a right of first refusal had been
>          exercised that made the additional 75,000 feet operable or operative?

This argument misconstrues the nature of a right of first refusal by ignoring the possibility that the holder of such a right may purchase the burdened property or license without the right of first refusal having been triggered by a third party offer. Where this occurs, the holder of the right is in an appreciably different situation than if the right has been triggered and has much greater flexibility in terms of the price, terms, and timing of its offer. It is not required to match the price and terms of a competing offer and it is not required to make a snap decision to purchase or waive its right of first refusal. The fact that the holder possesses the right of first refusal may certainly influence the owner's willingness to sell to the holder (particularly where, as here, the right of first refusal includes a price ceiling); however, that the existence of the right may influence the seller's decision does not mean that it has been exercised. Where the holder of a right of first refusal purchases the subject property or license without first having been presented with a third party offer, it cannot be assumed that the holder purchased because the right of first refusal was triggered, as opposed to simply making a separate deal.

A right of first refusal is not self-executing; and it is not a substitute for an offer by the holder specifying the consideration to be paid. For this reason, a contract giving a party a contingent option to purchase property or a license on certain terms does not trump a subsequent contract selling the same property or license to the holder of the right on different terms. If X prepares a contract granting Y an option to purchase property for $100, but then enters into a subsequent contract to sell the same property

---

A        I – I mean, in general it was clear based on how we were operating that –
         that they had that territory. So the process had followed.

to Y for $50, the terms of the later contract govern the purchase price.  X can't show up

ten years later and say to Y, "you owe me another $50."

The Jandris Transfer Agreement contains terms that are not contemplated in the

provision granting KNE a right of first refusal and lacks terms that are contemplated by

this provision.  The final "Recital" in the Jandris Transfer Agreement states that "in

consideration of the promises, payment, agreements and other good and valuable

consideration set forth herein, and each party intending to be legally bound hereby, the

parties have agreed as follows . . . ."  The contract then proceeds to lay out each

party's obligations.  Pursuant to the agreement, KRWS expands KNE's territory to

include Western Massachusetts, agrees to pay KNE a portion of the royalties received

from Jandris, and agrees to transfer the territory back to KNE should the license

agreement with Jandris be terminated.  In return, KNE agrees to transfer Western

Massachusetts and portions of Eastern Massachusetts back to KRWS so that KRWS

can deal directly with Jandris.

As far as the Court can tell, there is no provision in the Jandris Transfer

Agreement regarding the payment of any "initial license fee."  The defendants have

submitted a letter from Dawson to Albert that was signed by both indicating that Albert

was waiving $12,500 which KNE would otherwise have been entitled to "effective upon

the execution of the Jandris Transfer and License agreements," however, the letter

does not say anything about what the payment was for or whether KNE had exercised

its right of first refusal.  The Jandris Transfer Agreement adds obligations for both

parties that are not specifically contemplated by the right of first refusal, suggesting that

the agreement represents a new deal.  What is missing from the Jandris Transfer

Agreement (and, for that matter, from any other writing in the record) is an indication that KNE accepted a 75,000 square-foot increase in return for Western Massachusetts. The language in the Gagne Agreement granting KNE a right of first refusal for Western Massachusetts is not equivalent to an offer from KNE to accept a 75,000 square-foot increase in return for Western Massachusetts. Having a right is not the same thing as exercising it. Based on the plain language of the Jandris Transfer Agreement, the Court concludes that an increase in KNE's quota was not a part of the deal.

Alternatively, even if the Court were to find that the silence of the Jandris Transfer Agreement with regard to an increase in KNE's quota created only an ambiguity in the Jandris Transfer Agreement, the parol evidence is so weak that, as a matter of law, no reasonable jury could find for the defendants on this issue.[5] The defendants offer the Schramm Affidavit (ECF No. 109-3) in support of their claim that KNE exercised its right of first refusal. Schramm asserts that the plaintiff obtained the Territory of Western Massachusetts "as a result of [its] right of first refusal" and then transferred the territory back to allow KRWS to deal directly with Jandris. It is not clear from the affidavit if or why Schramm would be qualified to testify about the parties' intent regarding the consideration for the Jandris Transfer Agreement. There is no indication

---

[5] The defendants contend that by arguing that the contract is ambiguous and requires the examination of parol evidence, the plaintiff is conceding that it is not entitled to summary judgment on the meaning of the contract. Defs.' Resp. in Opp'n to Pl.'s MSJ at 5. In support of this argument the defendants cite the holding of the South Carolina Court of Appeals in *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 241, 672 S.E.2d 799, 802 (Ct. App. 2009) that "[s]ummary judgment is improper when there is an issue as to the construction of a written contract and the contract is ambiguous," and that it should be denied where "the intent of the parties cannot be gathered from the four corners of the instrument." The applicable standard on a motion for summary judgment has been held to be a procedural matter, so Federal law, not South Carolina law, governs in this matter. As discussed above, if the court finds the contract ambiguous, it may then "examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245.

in the affidavit that he was, in any way, involved in the negotiation, preparation, or execution of the Jandris Transfer Agreement and there is no explanation of how he knows that the parties intended for KNE to accept an increased quota as a condition of the agreement.  The affidavit simply indicates that Schramm is "the Sales Manager" for KRWS and that his "duties and responsibilities include interacting with Keystone's licensees."  (Schramm Aff. ¶¶ 1-2, ECF No. 109-3.)  The affidavit of Dan Albert alleges that KNE never exercised its right of first refusal, that no third-party offer was ever presented to KNE by KRWS, that KNE never agreed to an increase of 75,000 square feet in its performance requirements, and that KRWS never expressed its apparent belief that KNE's quota had been increased to 575,000 square feet prior to the March 17, 2009 termination letter.  (*See* Aff. of Daniel B. Albert, ¶¶ 9-10, ECF No. 115-9.)

Dawson, who signed both the Gagne Transfer Agreement and the Jandris Transfer Agreement, testified that he did not recall KNE having exercised its right of first refusal:

> Q    Looking at G3, if you'll read that paragraph that pertains to a right of first refusal to obtain the license to the Western Massachusetts territory.
> A    Uh-huh.  Yes.
> Q    Do you recall those discussions pertaining to that?
> A    I do – I don't know that I recall the discussions.  I do recall this provision being part of this agreement.
> Q    And do you know if that – if a right of first refusal was ever exercised by Keystone Northeast?
> MR. JOYCE:        Objection
> THE WITNESS:      No, not to my recollection.
> BY MR. LANDIS:
> Q    You don't recall there ever being a right of first refusal that was exercised by Keystone Northeast to the Western Massachusetts territory?
> A    Not to my recollection, no.

(Dep. of Bill Dawson, 63:19 – 64:13, Nov. 11, 2014, ECF No. 110-3.)

Dawson also testified that he believed that KNE's quota was 500,000 square feet at the time he prepared and signed the 2005 License Agreement, which would not have been the case if KNE had exercised its right of first refusal.

> Q . . . . Having the benefit of the '98 agreement in front of you, what would the performance requirements have been from September of 2005 through December 31 of 2010?
> A I believe that what we intended was that it would be the 500,000 that was for the most current year.
> Q And that it would have continued –
> A Right.
> Q That as of September of 2005, Keystone Northeast's annual performance quota would be 500,000 square feet for each year from 2005 through December 31st of 2010.
> MR. JOYCE:  Objection
> THE WITNESS:  That's my recollection.

(*Id.* at 124:24 – 125:14.)

The defendants stress that Dawson did not personally prepare the Transfer Agreements and would not have known either way whether KNE had exercised its right of first refusal. However, Dawson testified that if KNE had exercised the right of first refusal, it would have been something that he *would* have been aware of at the time. While he could not say that the right had not been exercised, he was clear in his testimony that he did not recall it being exercised. (*See id.* at 138:6-20.) Furthermore, Dawson signed all of the Transfer Agreements, and he was the person who sent the letter to Albert indicating that the $12,500 would be deducted from his royalty share, which the defendants claim shows that KNE matched an offer from Jandris. Even if this testimony does not hurt the defendants, it certainly does nothing to help them. In short, if there were an ambiguity in the Jandris Transfer Agreement, no reasonable jury could find that KNE's acceptance of a 75,000 square-foot increase was a condition of that agreement based on the evidence that has been presented to the Court.

Finally, an examination of the evidence also reveals that the defendants have failed to forecast sufficient evidence that an independent third-party offer was ever made to KRWS and presented to KNE.  As the analysis above makes clear, a right of first refusal is distinct from a simple option to purchase in that it must be triggered by a third-party offer.  The defendants emphasize that, pursuant to the Gagne Transfer Agreement, the "*only terms* of a third party offer" that KNE had to meet to exercise its right of first refusal were the payment of the license fees and the acceptance of the increased quota, suggesting that there was no requirement that they present the terms of a third party offer to KNE.  The Court disagrees.  The quoted language pertains to what the plaintiff had to do to meet the terms of a third-party offer, it does not excuse the defendants from the obligations implied in a right of first refusal that the owner actually secure a third-party offer and convey its terms to the holder of the right.  While there is some ambiguity about what type of notice is required to trigger the right, courts appear to agree that notice of some form is required and that it must provide "reasonable disclosure" of the terms of the third party offer.  *See, e.g.*, *Dyrdal v. Golden Nuggets, Inc.*, 672 N.W.2d 578, 585 (Minn. Ct. App. 2003) *aff'd,* 689 N.W.2d 779 (Minn. 2004) ("Minnesota courts have not yet determined how specific the notice of a proposed sale must be when, as in this case, the agreement granting the right of first refusal does not specify what information needs to be disclosed. Other courts have ruled, however, that owners have an initial duty to make only reasonable disclosure of an offer's terms.").

As noted above, Albert's affidavit attests that he was never presented with a third-party offer.  The Schramm Affidavit offers no indication about if or how the terms of

a third-party offer were conveyed to KNE. However, a March 3, 2009 email from Schramm to Ed Zax indicates that Schramm did not believe there had actually been a third-party offer:

> Read section G iii) as this is potentially important. The one about the added 75,000 sq ft. quota is the important part. Does this mean his quota goes up 75,000 if we give him the west half of Mass or is the 75,000sqft add contingent upon him 'matching a third party offer'?[6] We gave him the west half of Mass in a later agreement. *We had no third party offer that I am aware of.*

(ECF No. 110-5 (emphasis added).)

The defendants rely on the deposition testimony of Dana Morse, the president of Jandris, to establish that a third party offer was made:

> Q:    [D]id you contact anyone at Keystone Retaining Walls regarding the availability of that territory?
> A:    Yes.
> Q:    Who? If you recall?
> A:    Several people. I've inquired about the Western Mass. territories since day one and I was told back in the beginning that it was unavailable; that another producer had it – had that area, so it has come up on and off over the years. I have let several people at corporate know that along with Dan Albert, that I would be interested in Western Mass. if the situation were to ever change.
> Q:    Do you know if that situation did change?
> A:    I believe the manufacturer that was handling or producing for that area stopped producing Keystone at some point and I believe was no longer available to produce for that area.

(Deposition of Dana Morse 15-16, Apr. 9, 2014, ECF No. 109-5)  This testimony cannot establish that Jandris made a specific offer for Western Massachusetts, but just that it expressed interest.

Even the testimony of Ed Zax, the president of KRWS is unhelpful to the defendants on this point. In the following passage of his deposition, Zax explains what

---

[6] Schramm's email highlights the distinction at the core of this case. His first proposed answer is essentially the position the defendants have taken, but his second proposed answer is much closer to an accurate description of what 5(G)(iii) provides.

he learned from a conversation with Dana Morris of Jandris concerning the events that

led to the Jandris Transfer Agreement:

> . . . . And so then it [the Territory of Western Massachusetts became
> available.  And so then Dana had reached out in an interest for that
> territory.  And the way he explained it to me was that – that I think he was
> talking to the region manager of Keystone at the time and he said that –
> let me check into it and they followed up with him, said we'll have to run
> this through Dan Albert, we have to work everything through Dan Albert
> and he has to be a part of the deal.  So he has the ability to have that
> territory.
> I don't know that he told me, you know.  That he was that he has to
> have a right of first refusal.  I don't think he used those words.  But he told
> me that Dan Albert had to – to be communicated with about the
> opportunity for Jandris to be directly involved with that territory. . . .  So
> they [Jandris and KNE] had gotten together, decided they wanted that
> territory and – and they did it.

(Dep. of Edward H. Zax, 127:4-20,127:25 -128:1, Nov. 20, 2014, ECF No. 109-10.)

The Court is not suggesting for a moment that this arrangement violated KNE's

right of first refusal, but it didn't trigger an obligation to match a third-party offer because

KRWS redirected the interest expressed by Jandris into what essentially became a joint

proposal involving KNE and Jandris.  In other words, KRWS worked around the right of

first refusal by involving KNE in the deal from the outset.  All of this is good and fair.

What is not fair, however, is for KRWS to claim that because the existence of the right

of first refusal shaped the deal that was ultimately reached, the right of first refusal was

exercised and KNE was on the hook for an extra 75,000 square feet without any

mention of this fact in the Jandris Transfer Agreement or any other subsequent writing.

The Court finds that, on this record, there is no genuine issue of material fact

regarding whether KNE accepted the addition of 75,000 square feet to its quota as a

part of the Jandris Transfer Agreement.  Accordingly, KNE's annual performance quota

for 2008 was 500,000, and not 575,000 square feet.  It is undisputed that KNE's

performance in 2008 exceeded 500,000 square feet, and thus KNE did not default on the License Agreement as alleged by the defendants. The defendants have not identified a valid alternative basis for their decision to terminate the license agreement at the end of 2008, and the Court finds that the defendants breached the same.

### *Breach of the Implied Duties of Good Faith and Fair Dealing*

Despite dramatic shortfalls in the 2008 performance of Gagne, Jandris, and Hiway, who, collectively, met substantially less than 50% of their combined quotas for the year, KRWS declined to terminate their contracts. However, when it came to the plaintiff, who was relying on the sales of these manufacturers to meet its quota, the defendants terminated the plaintiff, despite the fact that the sales for which he received credit exceeded over 95% of the (inflated) quota the defendants were holding him to. The plaintiff argues that this result cannot be permitted under the Transfer Agreements. The Transfer Agreements appear to have been structured to get the plaintiff out of the picture in Maine and portions of Massachusetts while preserving for him a continuing interest in those territories in consideration of the fact that the plaintiff was relinquishing a valuable right. To this end, the Transfer Agreements contained two provisions to protect the plaintiff's interest.

First, the plaintiff was to receive credit toward its sales quota for any sales made by its former manufacturers. By 2008, the collective performance quota for Gagne, Jandris, and Hi-Way had increased to 1,300,000 square feet, whereas the plaintiff's quota had remained at 500,000 square feet (or if the defendants' figures were accepted 575,000 square feet) since 2003. Thus, if the plaintiff's former manufacturers met even half of their quotas, the plaintiff would easily meet its quota. Furthermore, the combined

initial quotas imposed on Gagne and Jandris always met or exceeded the plaintiff's quota, so that as long as Gagne and Jandris met their quotas, the plaintiff would meet its quota.  The license agreements in which the applicable quotas were spelled out were attached as exhibits to the Transfer Agreements, and the plaintiff argues that he specifically negotiated for and relied upon these requirements.

Second, the Transfer Agreements provided that if the license agreement between KRWS and KNE's former manufacturer were terminated "for any reason," the territory would revert back to KNE under the terms of the then existing License Agreement.  As in its license agreement with KNE, KRWS's license agreements with the plaintiff's former manufacturers allowed it to terminate for a failure to meet quotas.  Albert consequently assumed that even if his former manufacturers failed to meet their quotas, he would, at the very least, get another shot at developing business in his former territories.

At least for a time, the defendants appeared to be under this impression as well.  In a March 3, 2009 email to Ed Zax, Schramm, who later conveyed KRWS's termination decision to Albert, writes:

> I think our best bet is NOT to base the default on sales quotas. If we say he has not met his min sq ft, all he has to say is that Gagne, Hi-Way and Jandris did not meet theirs and if they would have Albert would have met his. If the three do not meet theirs, cancel them as well.  The problem: It states in every Transfer agreement that if we cancel any of the three, their territory automatically reverts back to Albert!!!

(ECF No. 110-5.)

The Court need not reach the question of whether the defendants violated the implied covenant of good faith and fair dealing because the Court concludes that the defendants directly breached the explicit terms of both the License Agreement and the

Transfer Agreements by terminating the License Agreement without sufficient grounds and discontinuing the royalty payments owed under the Transfer Agreements.  The Court did, however, wish to discuss the undisputed facts supporting the plaintiff's argument on this claim because the argument may become relevant on the issue of damages.  The Court sincerely doubts that the parties originally intended for the defendants to be able to manipulate the quotas in the manner described as a basis for terminating the plaintiff but continuing to deal with its former suppliers.  The defendants are entitled to run their business as they see fit and are not under an obligation to enforce or waive the quotas imposed on KNE, Gagne, Jandris, Hiway, or any of their other suppliers.  However, the plaintiff has a good argument that the intentional manipulation or grossly selective enforcement of the quotas for the specific purpose of cutting the plaintiff out of the deal and avoiding the reversion of its territories would breach the implied covenant of good faith and fair dealing under Minnesota or South Carolina law.

### B. Assuming that it did not have a right to terminate the License Agreement at the end of 2008, would KRWS have been able to terminate the License Agreement as a matter of right at the end of 2010?

Having found that KRWS did not have the right to terminate the License Agreement with KNE at the end of 2008, the question becomes whether they would have had the right to terminate when the 2005 License Renewal Agreement expired in 2010.  The defendants argue that they would have had such a right and would have exercised it, so the plaintiff's damages should be limited to, at most, the royalty shares from Gagne, Jandris, and Hiway through the end of 2010.  (*See* Defs' Mem. in Supp. of Mot. for Sum. J., ECF No. 109-1.)  In support of this argument the defendants cite a clause in the agreement that Albert signed when he transferred his license from

Madawaska to Pavers Plus GSP, Inc. (d/b/a Keystone Northeast), which provides: "7. We are aware that there is no assurance that the license we are acquiring will be renewed or extended upon the expiration date set forth in the License Agreement." (*See* Am. Compl., Ex 4, ECF No. 39-3.)   The problem with this argument is that the agreement the defendants are citing was executed in 1994, before the parties had signed the 1998 License Agreement.

The 1998 License Agreement contains an agreement to renew the license for "successive year terms."  Of course, the parties could mutually agree to terminate the license agreement, but it does not appear that there was any provision that would have allowed KRWS to unilaterally terminate the agreement without some sort of default, misrepresentation, or insolvency on the part of KNE.  Furthermore, the defendants have not directed the Court to any binding Minnesota authority holding that such contracts are prohibited or even disfavored.  The Court finds the 1998 License Agreement to be clear in its terms, so there is no need to resort to parol evidence.

Even if the agreement were ambiguous, the parol evidence again supports the plaintiff's position to such an extent that there is no genuine issue of material fact.  The plaintiff directs the Court to the deposition of Al Pfannenstein, who worked for KRWS for many years in the 1990s and 2000s and was familiar with the relationship between KRWS and KNE.  Pfannenstein offered the following description of how renewals with KNE were handled, which is consistent with the language of the License Agreement discussed in the preceding paragraph:

> Q:     Do you recall which license agreements you reviewed?
> A:     The only one I can remember -- you know, Dan had an -- they call it
>        an Evergreen Agreement.  Basically, it didn't expire, as long as you
>        met your quotas. It was just constant renewal.

(Dep. of Al Pfannenstein, 52:20-25, Nov. 12, 2014, ECF No. 115-3.)

> Q:    And was that something that was common, the Evergreen Agreements? Was that something that was common within Keystone, or was it fairly unique to Keystone Northeast?
>
> A:    No. I think it was fairly unique. I think we had it with just the one -- maybe Keystone had it with one or two licensees, and that was back in the early days when Keystone hired somebody to write their agreements and realized very quickly that it wasn't the route to go.
>
> Q:    And so, they realized that Keystone Northeast and a couple of other licensees had perhaps more favorable agreements than others?
>
> A:    Yeah.
>
> Q:    That's a yes?
>
> A:    Yes.

(*Id.* at 53:1-16.)

Additionally, the plaintiff has asserted, and the defendants do not appear to contest, that there were multiple years where the parties did business under an "expired" agreement.  The plaintiff's counsel argued that because the 1998 License Agreement provides that it will be renewed in the absence of default and other specified breaches the renewal process was primarily an opportunity for the parties to renegotiate their quotas.  This appears to be a reasonable explanation in light of the parties' course of dealings.  For these reasons, the Court cannot accept the defendants' claim that they would have been entitled to terminate the License Agreement at the end of 2010 without the plaintiff's consent and without any default or specified breach justifying termination.

### C. Is KRWS's obligation to share the Gagne, Jandris, and Hiway royalties with KNE independent of the License Agreement?

A more difficult question involves whether the defendants' obligations under the Transfer Agreements persist if the License Agreement is terminated.  The defendants argue that if the Transfer Agreements are truly separate from the License Agreement,

32

they are governed by South Carolina law and terminable at will.  The Court finds this argument unpersuasive.  It agrees with the plaintiff that KNE fulfilled its obligations under the Transfer Agreements when it ceded back to KRWS the transferred territories to allow KRWS to enter into direct licensing agreements with his former manufacturers.  In exchange, KNE received a future interest in the royalties generated by that relationship.

This is not the same thing as a perpetual contract or a contract without a term.  The defendants' obligation to share royalties may be ongoing, but the plaintiff received its interest in those royalties at the time it transferred its territory.  In this respect, the court agrees that the Transfer Agreements are, to some extent, analogous to the contracts at issue in *McDonald v. Scitec, Inc.*, 2013 ME 59, 79 A.3d 374 (2013) and *Lura v. Multaplex, Inc.,* 179 Cal.Rptr. 847, 129 Cal.App.3d 410 (1982).  The Court does not understand the plaintiff to be relying on these cases as controlling precedent, but simply to illustrate the point that a contract is not indefinite where one party performs and the return consideration is a definite interest, such as portion of the other party's future earnings enabled by the performance.

The defendants also argue that "the Transfer Agreements provided that if these manufacturers [Gagne, Jandris, and Hiway] lost their right to manufacture Keystone products in those areas, those areas would return to Plaintiff, but only if Plaintiff had a "then current license agreement" with Keystone."  This is not how the Court would characterize those provisions.  The provisions require that if the license agreements between the manufactures and KRWS are "terminated for any reason," KRWS "shall amend [KNE's] then current license agreement to include [the respective transferred

territory]." Consistent with its ruling above, the Court rejects the suggestion that the territory would only revert back to KNE if its license was "current." In other words, the Court interprets the word "current" to refer to whatever license agreement the parties were operating under at the time of the reversion and not to suggest that the plaintiff would lose its rights under the Transfer Agreements if KRWS and KNE failed to timely renew the License Agreement. In such a situation, the most recent iteration of the License Agreement would control, just as it did in the instances where the License Agreement reached the end of its term and the parties waited a another year or two to renew it.

The Court does, however, agree with the defendants that a fair reading of the License Agreement and the Transfer Agreements together indicates that the parties contemplated that the Transfer Agreements would exist alongside the License Agreement, which would continue to be renewed provided that KNE met its minimal quotas. The Transfer Agreements clearly state in numerous clauses that they are amending the License Agreement, and the Court agrees that they are so closely related to the License Agreement that they should be interpreted together.

Furthermore, the Court does not interpret the Transfer Agreements as giving KNE a perpetual stake in any relationship between KRWS on the one hand and Gagne, Jandris, and Hiway on the other for a couple of reasons. First, KNE never had a perpetual right to control the KRWS licenses for Maine and Massachusetts. The Court will not interpret KNE to have transferred a right that was contingent on its continued adherence to the License Agreement and to have received, in exchange, a right that was independent of that agreement without a clear indication in the contract that this

was the parties' intent.  Second, the provision governing the reversion of the territories in the event of terminations with the underlying manufacturers along with the provisions allowing KNE to count the sales of the underlying manufacturers towards its quota suggest that the Transfer Agreements are contingent on the continuation of the License Agreement.  Accordingly, the Court finds that the Transfer Agreements are dependent on the License Agreement.

## II.  Tort Claims

The Court agrees with the defendants that the plaintiff's remaining tort claims, must be dismissed.  As an initial matter, the primary acts allegedly giving rise to these claims occurred in 2008 or earlier, well outside the statute of limitations.  The plaintiff has not presented a compelling argument that the statutes of limitation should be tolled or that the plaintiff lacked sufficient knowledge at the time to start the clock on these claims.  Indeed, the plaintiff does not appear to have addressed the statute of limitations argument at all in its briefing or its oral argument.

Additionally, the Court has carefully reviewed the record and finds that the plaintiff has failed to forecast evidence from which a reasonable jury could find for it on these claims.  While the fact that the plaintiff's former manufacturers made seemingly simultaneous decisions to stop offering it distributor level pricing, there simply is no evidence in the record that the defendants were involved in these decisions.

Finally, the Court also agrees with the defendants that they are entitled to summary judgment on the plaintiff's claims for breach of fiduciary duty.  The parties in this case were clearly involved in arm's length, business transactions, and the plaintiff has directed the Court to no valid basis for finding the existence of a fiduciary

relationship.  *See, e.g., Williams- Garrett v. Murphy*, 106 F. Supp. 2d 834, 840 (D.S.C. 2000) (Under South Carolina law, "a confidential or fiduciary relationship exists when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence.")  (citations omitted); *Pitts v. Jackson Nat. Life Ins. Co.*, 352 S.C. 319, 331, 574 S.E.2d 502, 508 (Ct. App. 2002) (describing "an arm's length commercial transaction, which does not give rise to a fiduciary relationship").

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment (ECF No. 109) is granted in part and denied in part, the plaintiff's motion for summary judgment (ECF No. 110) is granted to the extent set forth in this Order, and the Court finds as follows:

1.    The plaintiff's 2010 quota was 500,000 square feet and not 575,000 square feet.  Since the undisputed facts show that the plaintiff satisfied this quota in 2008, the defendants were not justified in terminating the License Agreement at the end of 2008 and breached the License Agreement when they did so.

2.    Because the License Agreement remained in force, the defendants also breached their obligations under the Transfer Agreements by failing to pay the plaintiff its share of the royalty fees due thereunder.

3.    The defendants would not have automatically been entitled to terminate the License Agreement at the end of the term in 2010, so the

plaintiff is not precluded from seeking damages accruing beyond that time.

4.    The Transfer Agreements do depend on the License Agreement, so the plaintiff did not have a perpetual right to receive royalties regardless of its compliance with the License Agreement.

5.    The defendants are entitled to summary judgment on the plaintiff's contractual interference and breach of fiduciary duty claims.

After reviewing this order, the parties are instructed to confer and identify what if any stipulations can be reached with regard to damages and what issues remain for trial. The Court will schedule a conference to discuss these matters with the parties prior to the beginning of the trial.

**IT IS SO ORDERED.**

s/ Bruce Howe Hendricks
United States District Judge

March 16, 2015
Greenville, South Carolina