UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Keystone Northeast, Inc., f/k/a Pavers Plus GSP, Inc., assignee of Madawaska Brick and Block Corp., <br><br> Plaintiff, <br><br> vs. <br><br> Keystone Retaining Wall Systems, LLC, f/k/a Keystone Retaining Wall Systems Inc., a division and wholly owned subsidiary of Contech Construction Products, Inc., <br><br> Defendants. | Civil Action No.: 6:12-cv-720-BHH <br><br> **Opinion and Order** |

This matter is before the Court on the motion of the defendants, Keystone Retaining Wall Systems, LLC ("KRWS") and Contech Construction Products, LLC ("Contech") (collectively "the defendants") for reconsideration and clarification (ECF No. 134) and on the motion of the plaintiff Keystone Northeast, Inc. ("KNE") to alter or amend (ECF No. 135). The Court will reconsider and revise its previous order as stated herein.

**BACKGROUND**

On March 16, 2015, the Court issued an Opinion and Order in this case granting in part and denying in part the defendants' motion for summary judgment and granting in substantial part the plaintiff's motion for summary judgment (ECF No. 131) (the "Summary Judgment Order"). The background of the case is thoroughly discussed in the Summary Judgment Order, and the Court assumes familiarity with the terms, facts,

1

and findings therein.  On March 20, 2015, the defendants filed a motion for reconsideration and clarification, moving the Court to reconsider its finding that "[t]he defendants would not have automatically been entitled to terminate the License Agreement at the end of the term in 2010, so the plaintiff is not precluded from seeking damages accruing beyond that time" ("Finding 3").[1]  In support of its request, the defendants cited a number of cases that, while relevant, were not cited in its original briefing.  At the Court's invitation, the plaintiff submitted a motion to reconsider the Courts finding that "[t]he Transfer Agreements do depend on the License Agreement, so the plaintiff did not have a perpetual right to receive royalties regardless of its compliance with the License Agreement" ("Finding 4").  Both parties have filed responses in opposition to the motions to reconsider.  (*See* ECF Nos. 136 and 137.)

## **STANDARD OF REVIEW**

The plaintiff filed its motion pursuant to Rule 59(e), and the defendants did not invoke a particular rule.  The Summary Judgment Order is an interlocutory order under Rule 54(b) because it did not resolve all of the claims to the point where judgment could be entered.  *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003) ("[A]n order of partial summary judgment is interlocutory in nature."); *Akers v. Caperton*, 998 F.2d 220, 223 (4th Cir. 1993) (observing that the disposition of a case that left the issues of damages and injunctive relief to be determined was an interlocutory order because it "did not adjudicate 'all the claims and the rights and

---

[1] The defendants also moved the Court to (a) hold that the plaintiff must show that it would have met its performance requirements under the License in the future, and that the duties of good faith and fair dealing do not alter this burden, and (b) hold that the plaintiff must prove lost profits, not just anticipated revenue.  Regarding the first issue, the Court's revised holding on the independence of the transfer agreements limits the significance of this issue.  The Court declines to rule further on the implied covenant of good faith and fair dealing.

2

liabilities of all the parties'") (quoting Fed. R. Civ. P. 54(b)). "Although the Fourth Circuit Court of Appeals has not specifically articulated the standard for evaluating a motion for reconsideration filed under Rule 54(b), the Court has held motions under Rule 54(b) are 'not subject to the strict standards applicable to motions for reconsideration of a final judgment.'" *Long v. O'Reilly's Auto. Stores, Inc.*, No. CIV.A. 6:12-901-MGL, 2014 WL 2864589, at *1 (D.S.C. June 23, 2014) (quoting *Am. Canoe Ass'n,* 326 F.3d at 514). "So long as the same case remains alive, there is power to alter or revoke earlier rulings." 18B Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure 4478, at 637 (2d ed. 2002).

Nevertheless, "[d]istrict courts in the Fourth Circuit look to the standards of motions under Fed.R.Civ.P. 59 for guidance." *Id; see also Pure Fishing, Inc. v. Normark Corp.*, No. CA 3:10-2140-CMC, 2012 WL 4009628, at *1 (D.S.C. Sept. 12, 2012) *aff'd,* 564 F. App'x 601 (Fed. Cir. 2014) ("This court finds the standard applicable to reconsideration of final orders useful, though non-binding.") As with a motion under Rule 59, "appropriate reasons for granting reconsideration under Rule 54 are: (1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice." *Long*, 2014 WL 2864589 at * 2. This Court notes that a party's failure to cite authorities that were available at the time of the original briefing and were clearly relevant is not typically a justification for a motion to reconsider under Rule 59. *See Great W. Cas. Co. v. Marathon Oil Co.*, No. 99 C 3101, 2001 WL 699957, at *3 (N.D. Ill. June 21, 2001) ("refus[ing] to permit [a party] to make new arguments using authorities that were available and relevant at the time [the party] filed its earlier motion"); *Noon v. Sailor*, No. NA99-0056-C-H/G, 2000

WL 684219, at *1 (S.D. Ind. Apr. 17, 2000) (cautioning that "a federal district court's decision is not a first draft, subject to a prolonged cycle of further comment, debate, and revision"); *Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001) (observing that "[h]indsight being perfect, any lawyer can construct a new argument to support a position previously rejected by the court, especially once the court has spelled out its reasoning in an order").

The defendants have not provided an explanation for their failure to cite most of the authorities upon which they now rely.[2]  The submission of these authorities at this stage is particularly problematic because the Court had originally scheduled the trial of this case to begin yesterday, affording the plaintiff a very limited opportunity to respond to this new authority.  The Court is reluctant to revisit a lengthy order, which was drafted following a careful review of extensive briefing, but it is mindful that its "ultimate responsibility" is "to reach the correct judgment under law."  *Am. Canoe Ass'n*, 326 F.3d at 515.

For this reason, the Court will consider the defendants' additional authority on Finding 3 and has also invited the plaintiff to move for the reconsideration of Finding 4.  The Court has always been uncomfortable with the defendants' arguments in support of Finding 4, but accepted them as a reasonable limitation on the harsh implications of Finding 3.  Furthermore, the importance of Finding 4 was arguably diminished by Finding 3 because the plaintiff would continue to receive the royalty share it was

---

[2] While it certainly would have been helpful to have had the authorities that the defendant has brought to the Court's attention the first time around, the Court recognizes that the parties have been working on shorter time frame because of the age of the case and the delays caused by the plaintiff's decision to terminate his original counsel late in the litigation.  The diligence and professionalism of counsel up to this point leaves the Court confident that this was a mere oversight in a complex matter.

...

promised provided that it met minimal quotas, which were less than half the quotas of its former manufacturers.  While the Court would prefer not to revise its Summary Judgment Order any more than necessary, it would be unfair to reconsider Finding 3 without also reconsidering Finding 4.

## **DISCUSSION**

As noted above, the defendants urge the Court to reconsider its ruling on Finding 3 and the plaintiff urges the Court to reconsider Finding 4.  Each will be discussed in turn.

### I.     **Finding 3**

The Court reached Finding 3 in response to the following question it posed in the Summary Judgment Order:

> B. Assuming that it did not have a right to terminate the License Agreement at the end of 2008, would KRWS have been able to terminate the License Agreement as a matter of right at the end of 2010?

(S.J. Order at 17.)  The Court found that "[t]he defendants would not have automatically been entitled to terminate the License Agreement at the end of the term in 2010," and that, consequently, "the plaintiff [was] not precluded from seeking damages accruing beyond that time."  (S.J. Order at 36-37.)  The License Agreement provided in relevant part:

> This Agreement shall commence as of the date hereof and continue until the first to occur of:
>
> (a)     January 1, 2001, with renewals for successive year terms as per the terms of previously existent license agreement with subsequent establishment of performance goals reasonably based upon previous years performance and market condition;
>
> (b)     Termination by mutual agreement of the parties;

    (c)    Termination under the provisions of Paragraph 20 of this Agreement;

    (d)    The failure of Licensee [KNE] to sell its quota square feet equivalent units of the Product in any given period as set forth in [attached schedule];

    (e)    The knowing or reckless provision by Licensee of a false Unit License Fee report; or

    (f)    Licensee becomes insolvent or is adjudicated bankrupt.

The Court found that this provision "contain[ed] an agreement to renew the license for 'successive year terms,'" (S.J. Order at 31.),[3] and that the reference to the "subsequent establishment of performance goals" indicated that KNE and KRWS would have the opportunity to renegotiate KNE's quotas when the License Agreement was renewed.

    The Court specifically noted that "the defendants ha[d] not directed [it] to any binding Minnesota authority holding that such contracts are prohibited or even disfavored." (S.J. Order at 31.) As the defendants indicate in their motion for reconsideration, they did cite the Eighth Circuit's holding in *W.K.T. Distribution Co. v. Sharp Electronics Corp.*, 746 F.2d 1333, 1335 (8th Cir. 1984) "for the proposition that under Minnesota law a contract is terminable-at-will if it has no definite duration, express or implied, provided reasonable notice of termination is given." (Defs.' Mot. for Reconsideration at 2.) Unlike the contract at issue in *W.K.T. Distribution Co.*, the License Agreement had a definite term. It imposed an obligation on the defendants to renew the License Agreement provided that the plaintiff satisfied its quota and otherwise

---

[3] The Court also found that, to the extent the License Agreement was ambiguous, the parol evidence demonstrated that the License Agreement was "evergreen," meaning that the defendants were obligated to renew it provided that the plaintiff met his quotas. (S.J. Order at 31-32.) The Court's revised finding is based on the application of Minnesota law to the language of the License Agreement, so parol evidence is not implicated.

complied with the agreement, but, even under the supplemental authorities submitted by the defendants, an agreement to renew (extend) a contract should not automatically be assumed unenforceable.

The authorities newly cited by the defendants support two Minnesota "rules" that appear directly applicable to the case at hand.[4] The first is a distinction between an extension and a renewal. As the defendants explain:

> "A renewal provision exists if a "contractual term for the additional period must be negotiated or determined." *Med-Care Associates, Inc. v. Noot*, 329 N.W.2d 549, 551 (Minn. 1983). This is different than an "extension," where all of the terms of the additional period are agreed and a party needs only to give notice that it intends to extend the contract. *See id.* Under Minnesota law, the presence of any uncertain or indefinite terms creates an option to renew. *See Camelot LLC v. AMC ShowPlace Theatres, Inc.*, No. CIV. 10-4255 ADM/JJK, 2011 WL 825681, at *4 (D. Minn. Mar. 7, 2011) ("any indefinite term is enough to transform an option to extend into an option to renew"), aff'd, 665 F.3d 1008 (8th Cir. 2012)."

(Defs.' Mot. for Reconsideration at 2.)

. . . .

> Under Minnesota law, where the terms necessary to continue a contract beyond its initial period are indefinite, the contract expires without renewal if no agreement is reached on those terms. *See, e.g., Camelot LLC*, 2011 WL 825681, at *4; *Camelot LLC*, 665 F.3d 1008, 1011-12 ("AMC must be required to pay some tax rent during an option period, but it is not possible to ascertain the amount from the existing lease. We conclude that the terms of the option period are not readily ascertainable and that [the provision at issue] is an option to renew that requires new, negotiated terms.").

(Defs.' Mot. for Reconsideration at 4.)

---

[4] *W.K.T. Distribution Co.* is not inconsistent with the authorities newly cited by the defendants, but it is not dispositive or persuasive in the way the newly cited authorities are.

7

The second rule, which is related to the first, is that agreements to agree are generally not enforceable under Minnesota law.

> "Agreements to agree "generally are deemed unenforceable because they provide neither a basis for determining the existence of a breach nor for giving an appropriate remedy." *Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (predicting and applying Minnesota law). *See also Lindgren v. Clearwater Nat'l Corp.*, 517 N.W.2d 574, 574 (Minn. 1994); *Mohrenweiser v. Blomer*, 573 N.W.2d 704, 707 (Minn. Ct. App. 1998)."

(Defs.' Mot. for Reconsideration at 3.)

The defendants argue that the provision governing the term of the License Agreement was an option to renew, as opposed to an option to extend, because it left a contractual term, the plaintiff's quota, to be determined. Additionally, the defendants argue that the provision requiring the parties to establish "performance goals reasonably based upon previous years performance and market condition" was an unenforceable "agreement to agree." Since this provision was essentially unenforceable, the defendants argue that it becomes hopelessly speculative to ask a juror to recreate the parties' negotiations, which would need to be done to determine whether the plaintiff could have maintained its position under the License Agreement.

The plaintiff does not contest the defendants' recitation of the law. Instead it argues that Minnesota law does not require "mathematical precision" in establishing future damages. This does not, however, respond to the fundamental issue identified by the newly cited authority – that the License Agreement would expire if the parties failed to agree on reasonable quotas and that the indefinite nature of the quotas makes the provision unenforceable.

8

Accordingly, the Court agrees with the defendants that Finding 3 should be reconsidered and revised as follows:  The defendants were not required to extend the License Agreement beyond the end of its term in 2010.  The plaintiff is entitled to damages proximately caused by the breach of the License Agreement from the end of 2008 to the end of 2010; however, the plaintiff is not entitled to damages for the future value of the license beyond 2010.

## II.     Finding 4

The Court reached Finding 4 in response to the following question posed in the Summary Judgment Order:

> C. Is KRWS's obligation to share the Gagne, Jandris, and Hiway royalties with KNE independent of the License Agreement?

(S.J. Order at 17.) The Court found that "[t]he Transfer Agreements . . . depend[ed] on the License Agreement, so the plaintiff did not have a perpetual right to receive royalties regardless of its compliance with the License Agreement."  The defendants argue that, combined with the Court's revised holding that they could decline to extend the License Agreement at the end of 2010, Finding 4 cuts off any damages the plaintiff might be entitled to because the defendants' obligations to share royalties with the plaintiff would have terminated at the end of 2010.  The plaintiff argues that the Court should reconsider its ruling that the Transfer Agreements are dependent upon the License Agreement, and the Court agrees.

Indeed, the Court is quite certain that it would not have reached the flawed conclusion that the Transfer Agreements are dependent upon the License Agreement, had it not first mistakenly concluded that the defendants were obligated to renew the

License Agreement as long as the plaintiff met its quotas thereunder. The Courts disagreement with the defendants' view of the Transfer Agreements is evident in the Summary Judgment Order itself, and, while the Court ultimately ruled for the defendants on the issue, it did so with substantial reservations believing that the issue would ultimately be of limited significance.

First, the Court identified this issue as challenging from the outset of its discussion. (*See* S.J. Order at 32 ("A more difficult question involves whether the defendants' obligations under the Transfer Agreements persist if the License Agreement is terminated.").) The Court's doubts about the defendants' arguments are evident in the fact that the Court spent all but the last two paragraphs of Section 1C of the Summary Judgment Order criticizing and qualifying the defendants' argument. When the Court ultimately ruled for the defendants on the issue, it suggested that the ruling went hand and hand with Finding 3. (*See* S.J. Order at 34 (The Court "agree[s] with the defendants that a fair reading of the license agreement and the transfer agreements together indicates that the parties contemplated that the transfer agreements would exist alongside the license agreement, *which would continue to be renewed provided that KNE met its minimal quotas*.") (emphasis added).)

Second, before the Court even reached the issue of whether Transfer Agreements were "dependent" on the License Agreements, it rejected the notion that the defendants could terminate the plaintiff's rights under the Transfer Agreements by simply declining to renew the License Agreement:

> [T]he Court rejects the suggestion that the territory would only revert back to KNE if its license was "current." In other words, the Court interprets the word "current" to refer to whatever license agreement the parties were operating under at the time of the reversion and *not to suggest that the*

10

> *plaintiff would lose its rights under the Transfer Agreements if KRWS and KNE failed to timely renew the License Agreement.* In such a situation, the most recent iteration of the License Agreement would control, just as it did in the instances where the License Agreement reached the end of its term and the parties waited a another year or two to renew it."

(S.J. Order at 34 (emphasis added).)  Thus, while the Court implied that the plaintiff could lose its rights under the Transfer Agreements by violating the terms of the License Agreement, it did not suggest that the defendants could continue to do business with the plaintiff's former manufacturers and relieve themselves of their obligations under the Transfer Agreements by simply letting the License Agreement lapse.  The Court is quite confident that this was not the parties' intent.

Finally, the Court's view of the Transfer Agreement as a completed transaction is inconsistent with the defendants' claim that payment under the Transfer Agreement was contingent on the parties' renewal of the License Agreement.  As the Court explained in the Summary Judgment Order:

> The defendants argue that if the Transfer Agreements are truly separate from the License Agreement, they are governed by South Carolina law and terminable at will.  The Court finds this argument unpersuasive.  It agrees with the plaintiff that KNE fulfilled its obligations under the Transfer Agreements when it ceded back to KRWS the transferred territories to allow KRWS to enter into direct licensing agreements with his former manufacturers.  In exchange, KNE received a future interest in the royalties generated by that relationship.

(S.J. Order at 32-33.)  This understanding is consistent with the purpose of the Transfer Agreements, which, as the defendants point out, was "completely opposite" to the purpose of the License Agreement.  (Pl.'s Mot. for Reconsideration at 4.)  "The License Agreement gives license rights to KNE, but the Transfer Agreements take rights away from KNE in consideration of KRWS paying a share of royalties generated by Gagne, Jandris, and Hi-Way."  (Id.)  For these reasons, the Court views its decision to

11

reconsider Finding 4 to be consistent with the underlying reasoning of the Summary Judgment Order and the understanding of the contracts reflected therein.

Turning to the arguments that the Court relied upon to reach Finding 4, the Court finds them to be outweighed by stronger arguments that have come to light since the Court issued the Summary Judgement Order. First, the Court relied on the fact that the Transfer Agreements amended the License Agreement. (See S.J. Order at 34 ("The Transfer Agreements clearly state in numerous clauses that they are amending the License Agreement").) Upon further consideration, however, the Court notes that only specific provisions of the Transfer Agreements state that they are amending the License Agreement. If the Transfer Agreements were intended to be interpreted as mere amendments to the License Agreement that imposed no independent obligations, there would be no reason for the parties to specifically state the instances where the Transfer Agreements were amending the License Agreement. Additionally, as the plaintiff argues, the Transfer Agreements seem to refer to the License Agreement as a separate contract, (Pl.'s Mot. for Reconsideration at 5), and nowhere in any of the Transfer Agreements are the agreements referred to as a collective whole. Finally, the Transfer Agreements modify the plaintiff's rights under the License Agreement by eliminating the plaintiff's rights and responsibilities in the transferred territories and allowing the plaintiff to benefit from the direct relationships that the Transfer Agreements permitted KRWS to form with the manufacturers. It is, therefore, reasonable that the plaintiff's rights under the Transfer Agreements are contingent on the survival of the relationship between the manufacturers and KRWS, and not on the survival of the relationship between the plaintiff and the defendants.

Second, the Court was hesitant to find that the Transfer Agreements had given the plaintiff a potentially longstanding right to share in royalties without specifically indicating that the right would continue as long as the relationship between KRWS and the underlying suppliers continued. However, upon reconsideration, the Court concludes that the silence of the Transfer Agreements in this respect is less troubling than its silence regarding what, if anything, the plaintiff had to actively do to maintain its rights under the Transfer Agreements. This is especially true because the defendants drafted the Transfer Agreements, and the individual who executed them on behalf of the defendants was a Stanford-trained lawyer. The defendants could have easily avoided the confusion that led to this litigation by being clear in the Transfer Agreements. They could have placed a time limit on their commitment to share royalties, they could have indicated that all of their responsibilities under the Transfer Agreements were dependent on the existence of the License Agreement and that it had to be current, they could have required the plaintiff to meet any number of benchmarks in order to maintain its right to payments under the Transfer Agreements. They did none of these things. On reconsideration of the Summary Judgment Order, the Court interprets the Transfer Agreements to have imposed only those conditions that its clear language described – the requirement that KNE transfer the relevant territory, which it clearly did.

Although the Court need not reach parol evidence, the evidence in the record supports the plaintiff's position as well. In a September 1, 2005 email to Dan Albert, Bill Dawson wrote, "Remember that the Territory does not include the areas that are already licensed directly; they are separately handled, and *your rights there continue without need for renewal.*" (ECF No. 115-1 (emphasis added).) Dawson subsequently

13

testified that while the conversation he was having with Albert concerned a proposal to extend the License Agreement, the phrase "areas that are already licensed directly" referred to the territories that KNE had ceded back to KRWS under the Transfer Agreements. (*See* Dep. of Bill Dawson, 114:9 – 115:22.) This testimony contradicts the defendants' assertion that their obligations under the Transfer Agreements were subject to the term of License Agreement and could be terminated at its conclusion.

Moreover, the parties' course of performance undermines the defendants' position. "If a contract is ambiguous, relevant evidence may be taken from the parties' course of performance, their course of dealing, and their usage of trade." *Glacial Plains Co-op. v. Chippewa Valley Ethanol Co., LLP*, No. A10-869, 2011 WL 382710, at *4 (Minn. Ct. App. Feb. 8, 2011). As the Minnesota Supreme Court explained, "where parties to a contract have given it a practical construction by their conduct, as by acts in performance thereof, such construction may be considered by the court in determining its meaning and in ascertaining the mutual intent of the parties, and where such extrinsic evidence is conclusive and undisputed and renders the meaning of the contract clear, the situation presents a question of law for the court." *Cut Price Super Markets v. Kingpin Foods, Inc.*, 256 Minn. 339, 354, 98 N.W.2d 257, 268 (1959). "Evidence of course of performance is useful because it demonstrates the parties' practical construction of the terms of a contract, which is probative of their intent." *Glacial Plains Co-op.*, 2011 WL 382710, at *4. "It is well recognized that where the meaning of a contract is doubtful, the practical construction which the parties have placed upon it will be followed by the courts." *Cornell v. N. F. C. Eng'g Co.*, 274 Minn. 391, 395, 144 N.W.2d 369, 372 (1966).

It appears that the License Agreement lapsed at the end of 2003 and was not renewed until 2005. The plaintiff alleges as much in its complaint, (see Am. Compl. ¶¶ 74-81), and the defendants do not appear to contest the assertion. Additionally, the Court has reviewed the relevant agreements in this case and it appears that the Gagne Transfer Agreement extended the License Agreement through December 31, 2003, but that the License Agreement was not extended again until the parties executed the 2005 Renewal Agreement on September 12, 2005. The defendants have emphasized that "[u]nder Minnesota law, where the terms necessary to continue a contract beyond its initial period are indefinite, the contract expires without renewal if no agreement is reached on those terms." (Defs.' Mot. for Reconsideration at 4 (citing *Camelot LLC*, 2011 WL 825681, at *4; *Camelot LLC*, 665 F.3d 1008, 1011-12).) This argument is the very basis of the defendants' motion to reconsider Finding 3. Assuming that this is the law as the defendants claim, the License Agreement was arguably expired for over a year-and-a-half between the end of 2003 and September of 2005. There is no indication, however, that the defendants stopped sharing royalties with the plaintiff, which is at least some evidence that the parties did not consider the plaintiff's right to receive royalties to be contingent on the existence of a *current* License Agreement.

The final factor the Court cited in favor of Finding 4 is that the Transfer Agreements include a right of reversion that would return territory to the plaintiff under the terms of the "then current license agreement," and that the Transfer Agreements give the plaintiff credit for the sales of its former manufacturers. As the plaintiff explains in its motion to reconsider, the fact that the Transfer Agreements provide for the reversion of territory and allow KNE to count the sales of Gagne, Jandris, and Hiway

toward its quota does not compel the conclusion that the right to royalty shares under the Transfer Agreements was contingent upon the License Agreement when considered in context.

> [T]he structure of the Transfer Agreements was first established by the Gagne Transfer Agreement in 1999. At the time of the Gagne Transfer (and for several months thereafter), KNE continued to maintain a direct license for the territories that were later transferred to Jandris and Hi-Way. Prior to the transfers to Jandris and Hi-Way, KNE had a quota that exceeded the minimum quota negotiated for Gagne. Furthermore, there always remained the possibility that Gagne, Jandris, or Hi-Way would stop doing business with KRWS, in which event their respective territory would revert back to KNE. At that time, KNE would again be in control of the reverted territory and would not be guaranteed that it would meet its quota by Jandris's sales alone. By way of example, in 2000, KNE's quota was 350,000 sf, Gagne's quota was 150,000 sf, and Jandris's quota was 300,000 sf. If Gagne ceased doing business with KRWS that year and its territory reverted to KNE, Jandris's minimum quota would be 50,000 square feet less than KNE's minimum.

(Pl.'s Mot. for Reconsideration at 4-5.) Thus, the plaintiff argues that the existence of provisions providing for reversion and allowing the plaintiff to count the sales of Gagne, Jandris, and Hiway toward its quota do not weigh in favor of concluding that the Transfer Agreements were contingent on the License Agreements. The Court finds this to be a reasonable explanation that undermines a basis for the Court's prior holding on Finding 4.

For all of these reasons, the Court is inclined to reconsider and revise Finding 4. The Court finds that the expiration of the License Agreement does not relieve the defendants of their obligation to pay the royalty fees due under the Transfer Agreements because those obligations under the Transfer Agreements are not contingent on the License Agreement.

## **CONCLUSION**

For the reasons set forth above, the defendants' motion for reconsideration and clarification (ECF No. 134) and the plaintiff's motion to alter or amend (ECF No. 135) are both granted to the extent set forth in this Order. The Court makes the following findings.

A. The defendants were not required to extend the License Agreement beyond the end of its term in 2010.

B. The plaintiff is entitled to damages proximately caused by the breach of the License Agreement from the end of 2008 to the end of 2010; however, the plaintiff is not entitled to damages for the future value of the license beyond 2010.

C. The expiration of the License Agreement does not relieve the defendants of their obligation to pay the royalty fees due under the Transfer Agreements because those obligations under the Transfer Agreements are not contingent on the License Agreement. Thus the plaintiff is entitled to its royalty share from the sales of Gagne, Jandris, and Hiway from the end of 2008 up to the date of this order. The parties may submit proposed orders on damages.

D. The defendants' motions to exclude the testimony of John Markel (ECF Nos. 127 & 133) are denied at this time without prejudice to the defendants' right to raise arguments consistent with this Order at trial.

The Court will hold a hearing tomorrow morning at 9 a.m. to consider the issue of damages and what, if any, issues remain for the jury.

**IT IS SO ORDERED.**

              <u>s/ Bruce Howe Hendricks</u>
              United States District Judge

March 25, 2015
Greenville, South Carolina

18